543 So.2d 1381 (1989)
Deborah Marie Bryant TRABEAU, et al.
v.
MACK TRUCKS, INC., et al.
No. 88 CA 0555.
Court of Appeal of Louisiana, First Circuit.
May 16, 1989.
Rehearing Denied June 23, 1989.
*1382 William E. LeBlanc, White Castle, for Deborah Trabeau.
Boris Navratil, Baton Rouge, for Illinois Cent. Gulf.
Richard T. Reed, Baton Rouge, for Aetna Cas. & Sur. Co.
Dan Edward West, Baton Rouge, for Mack Trucks, Inc.
Harvey Lee Hall, Baton Rouge, pro se.
Edward Gray, Baton Rouge, for Scott Hollingsworth Equipment Co., Inc.
Robert E. Barkley, New Orleans, pro se.
Before CARTER, LANIER and LeBLANC, JJ.
CARTER, Judge.
This is an appeal by Illinois Central Gulf Railroad from a judgment of the trial court finding the deceased, Kerry J. Trabeau, 55% at fault, and Illinois Central Gulf Railroad (ICG), 45% at fault. The fatal accident occurred at an ICG railroad crossing on Louisiana Highway 22 in Ascension Parish. The trial court awarded a total sum of $1,258,737.00 to the surviving wife and children, then reduced the award by 55% because of the negligence of the deceased, Mr. Trabeau. The trial court further rendered judgment in favor of intervenor, Aetna Casualty & Surety Company, for 45% of the compensation benefits it had paid to the Trabeau family.
We have studied and reviewed the entire record, including but not limited to the trial judge's findings of fact and written reasons, a copy of which is attached hereto and which we adopt as our own. We find no error on the part of the trial judge as to his findings of fact, application of the law thereto, and the conclusions reached by him. The trial court correctly analyzed the *1383 comparative fault of the parties as required by Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985). See also Lee v. Missouri Pacific Railroad Company, 540 So.2d 287 (La. 1989). There is no merit in appellant's specifications of error.
When a railroad undertakes to control traffic at a grade crossing, it has a duty to the motoring public to exercise a high degree of care in maintaining the devices installed for traffic control. This duty is comparable to that of the state in providing intersectional warning devices. See Lochbaum v. Bowman, 353 So.2d 379 (La.App. 4th Cir.1977), writ denied, 354 So.2d 1380 (La.1978). A railroad may be held liable under theories of negligence (LSA-C.C. art. 2316) and/or strict liability (LSA-C.C. art. 2317). See Johnson v. Kansas City Southern Railway Co., 531 So.2d 773 (La.App. 3rd Cir.1988), writ denied, 534 So.2d 445 (La.1988). The distinction between these theories is that under strict liability the plaintiff is relieved of proving that the owner or custodian of the thing which caused the damage knew or should have known of the risk involved. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982); Watson v. State Department of Transportation And Development, 529 So.2d 427 (La.App. 1st Cir.1988), writ denied, 533 So.2d 361 (La.1988); Burge v. City of Hammond, 509 So.2d 151 (La.App. 1st Cir.1987), writ denied, 513 So.2d 285 (La.1987). Under both theories, plaintiff must still prove that: (1) defendant owned or had custody of the thing which caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; and (3) causation. Burge v. City of Hammond, supra; Farr v. Montgomery Ward and Company, Inc., 430 So.2d 1141 (La.App. 1st Cir.1983), writ denied, 435 So.2d 429 (La.1983).
The duty/risk analysis is similar in strict liability and negligence liability cases. Entrevia v. Hood, 427 So.2d 1146 (La. 1983); Jacoby v. State, 434 So.2d 570 (La. App. 1st Cir.1983), writ denied, 441 So.2d 771 (La.1983). Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty. Entrevia v. Hood, supra; Farr v. Montgomery Ward and Company, Inc., supra; Hessifer v. Southern Equipment, Inc., 416 So.2d 368 (La.App. 1st Cir.1982), writ denied, 420 So.2d 982 (La.1982).
ICG had not only a duty to maintain appropriate warning devices at this crossing, ICG had a duty to maintain and have properly operating warning devices. The warning devices operating continuously a week preceding the accident, even when no train was approaching the crossing rendered the signals defective and created an "unreasonable risk of injury to others." This defective condition resulted from a failure of ICG to properly maintain the signals and was a violation of ICG's duty to guard against a condition that creates unreasonable risk of injuries to others. The duty of ICG to provide a properly operating warning device includes the risk of harm resulting from the device not operating at all as well as the risk that harm will result from its continued operation over an extended period of time when in fact no train was present.
A great risk of harm to the motoring public was caused by the railroad's failure to correct the malfunctioning crossing signals. Cf. Lee v. Missouri Pacific Railroad Company, supra; Cf. also Jenkins v. St. Paul Fire & Marine Insurance Co., 393 So.2d 851 (La.App. 2nd Cir.1981), affirmed, 422 So.2d 1109 (La.1982), a pre-comparative negligence case. We are convinced, as was the trial court, that the defective crossing signal was a vice or defect which occasioned an unreasonable risk of injury to the traveling public. The external stimuli of the flashing lights when no train was coming certainly altered the pattern of response by the traveling public and as time progressed caused a disregard of the signal. The situation is equivalent to constantly and repeatedly crying "wolf" when in fact no wolf is present. This dangerous condition created by the malfunctioning crossing lights is the precise situation that brings about the unreasonable *1384 risk of injuries to others and, in this particular case, was a cause of Mr. Trabeau's injury and death. The continuously operating warning devices deluded the traveling public into thinking that the way was clear. The duty to have properly operating warning lights clearly encompassed the risk of an accident and resulting injuries and death. Mr. Trabeau's conduct was inadvertent, and the negligence he displayed is a common reaction among the general public. Cf. Lee v. Missouri Pacific Railroad Company, supra; Cf. also Jenkins v. St. Paul Fire & Marine Insurance Co., supra.
Therefore, for the above reasons and the reasons of the trial court, which we adopt as our own, we affirm the decision of the trial court at defendant-appellant's costs.
AFFIRMED.

APPENDIX

23RD Judicial District Court

Parish of Ascension

State of Louisiana

No. 29,496

Deborah Marie Bryant Trabeau, et al

vs.

Mack Trucks, Inc., et al

Filed: Oct. 27, 1987

REASONS FOR JUDGMENT
The case arises out of a fatal accident at a railroad grade crossing on Louisiana Highway 22 in Ascension Parish. The evidence shows that at approximately 2:30 p.m. on August 22, 1980, Kerry J. Trabeau was driving a 1978 Mack truck-trailer on Louisiana Highway 22 in Ascension Parish. Mr. Trabeau was hauling sand from Darrow, Louisiana, to a construction site directly off of the 1-10 Interstate highway. The fatal accident occurred at a railroad grade crossing on Louisiana Highway 22 approximately 1.2 miles west of Louisiana Highway 44. At the intersection of Louisiana Highway 22 and the Illinois Central Gulf Railroad (ICG) grade crossing ICG operated and maintained a standard red blinking flashing system to warn approaching motorists of a train about to cross to highway. This track was not a main track of ICG and was used very little. During the week preceding the accident the warning signals for the railroad grade crossing were malfunctioning and had been continuously blinking even when no train was approaching the crossing. For 5 days preceding the accident, Mr. Trabeau had averaged between 7 and 9 trips per day over the accident route where he encountered the malfunctioning warning lights. In addition to the malfunctioning warning lights, on the motorist's right and on the trainman's left, there were trees and brushes along the railroad tracks and highway that impaired the view of Mr. Trabeau and the train crew. On the day of the accident, while making his last trip of the day, Mr. Trabeau was approaching the railroad crossing on Louisiana Highway 22 from the west when an ICG train emerged from behind some trees. Upon the sighting of the train by Mr. Trabeau and the truck by the train personnel, both believed that Mr. Trabeau was not going to clear the tracks and both took evasive action in an effort to avoid a collision. The train was put into emergency stop and Mr. Trabeau took to the ditch hitting the dirt foundation upon which ICG railroad tracks are laid, resulting in his death.

I. LIABILITY
Plaintiffs contend that defendant is liable to them under both the theory of strict liability and negligence.

A. STRICT LIABILITY
Louisiana Civil Code Article 2317 provides that:
"We are responsible, not only for the damages occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or the things we have in our custody."
An injured party seeking damages under Article 2317 need not prove negligence, that is that any particular act or omission on the part of the defendant caused his injuries. He must only prove three things:
*1385 1. That the thing which caused the damage was in the care or custody of the defendant;
2. That the thing had a vice or defect, that is, that it occasioned an unreasonable risk of injury to others, and;
3. That his injury was caused by the defect.
Shipp v. City of Alexandria, 395 So.2d 727 (La.1981); D'Angelo v. New Orleans Public Serv., Inc., 405 So.2d 1262 (La.App. 4th Cir.1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981); Jones v. City of Baton Rouge, etc., 388 So.2d 737 (La.1980) and Everett v. Louisiana Dept. of Transp., etc., 424 So.2d 336 (La.App. 1st Cir.1982).

i. Care and/or custody

Through stipulation of the parties it was established that the railroad crossing warning system at issue was under the care, custody and control of defendant, ICG.

ii. Vice and/or defect

The custodian or owner of a thing responsible for damages caused through a vice or defect of a thing, without personal negligence on his part (legal fault) ... being based upon the breach of his legal obligation to keep his thing in such condition or such control that it does no damage to others. A vice or defect of a thing is a condition which causes an "unreasonable risk of injury to another" and that "fault (of the person responsible for the thing) rests with his failure to prevent the risk creating harm and upon his obligation to guard against the condition" that creates unreasonable risk of injuries to others. Leoscher v. Parr, 324 So.2d 441 (La.1975), Rodrigue v. Dixilyn Corp., 620 F.2d 537 (5th Cir.1980).
A "defect" is some flaw or fault existing or inherent in the thing itself. Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writ denied, 429 So.2d 127, 134 (La.1983), Brown v. Winn-Dixie Louisiana, Inc., 417 So.2d 44 (La.App. 1st Cir.1982).
It was established by the evidence that the things under the control of ICG contained vices or defects that occasioned an unreasonable risk of injury to Mr. Trabeau. The evidence, through the testimony of several disinterested witnesses, is convincing that the flashing light warning system, at this particular crossing, was malfunctioning at the time of the accident, and had malfunctioned on a regular basis for a week prior to the accident. The lights would flash when there was no train going through the crossing. As was testified to by Mr. Lionel Prestly, he had passed the tracks at least 25 or 30 times the week of the accident and "just about all the time", the lights were on and he never saw a train approaching the tracks. Considering the setting in which these signals were malfunctioning only enhances the dangerous situation that existed. Photographs introduced at trial showed trees and brushes growing along the railroad tracks and highway that obstructed Mr. Trabeau's view of the train approaching from his right. Expert testimony concluded that at the point in time and location when Mr. Trabeau first could have seen the train, it was too late for him to stop in advance of the tracks and Mr. Trabeau, in taking to the ditch, acted reasonably when faced with such an emergency. Coupling the above facts with the testimony of Al Gonzales, plaintiff's expert, and Dr. Olin Dart, defendant's expert, wherein both explained the danger created by the malfunctioning lights, it is the opinion of this Court that as a matter of fact there did exist a vice and/or defect in the crossing signal in question which occasioned an unreasonable risk of injury.

iii. Causation

Conduct is a cause in fact of harm to another if it was a substantial factor in bringing about the harm. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
It is the position of the defendant that Kerry Trabeau's reaction to the appearance of the train, and not his reaction to the flashing lights is what caused his accident. Defendant states that if Mr. Trabeau had been responding to the signals or reacting to those signals, then he would have slowed down and stopped, and avoided the accident. This Court can not agree with *1386 the logic of defendant's position because it is not supported by the evidence.
If the signals had been properly functioning and Mr. Trabeau and not been subjected to a system that had been putting out false signals of approaching trains for a week prior to the accident, one might appreciate the argument put forth by defendant. However, the effect of the dangerous condition caused by the malfunctioning lights on Mr. Trabeau was clearly set forth by Mr. Al Gonzales, plaintiff's expert. He explained that external stimuli of the flashing lights being there, but no train ever coming, begins to alter the pattern of behavior, and as time progresses, the disregard for the signal increases and increases. This theory was supported by defendant's expert, Dr. Olin Dart, when he explained that the flashing of signals when no trains were coming detracts from the credibility of the signal and that unfortunately people get the idea that if they've had several experiences when the signal does not mean anything then there is a tendency to disregard the signal. This loss of credibility and inability to rely on the signal was not only experienced by Mr. Trabeau, but also Mr. Ledet and Mr. Prestly, who both testified that since they had gone through the crossing with lights flashing and no train coming several times for several days immediately prior to the accident that they started to disregard the signal and would not stop prior to going through the crossing.
The dangerous situation created by the malfunctioning crossing lights is precisely the type of situation that brings about unreasonable risk of injury to others and, in this particular case, was a cause of Mr. Trabeau's injury and death. It is therefore the opinion and factual finding of this Court that based upon a preponderance of the evidence the injuries and death of Mr. Trabeau were caused by the unreasonably dangerous defect in the railroad crossing signal.

B. NEGLIGENCE
The duty risk analysis as contained in Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962) is appropriate in deciding whether ICG is liable to the plaintiff in this case:
To establish a defendant's liability and recover tort damages, the plaintiff must be able to answer affirmatively the following questions: 1) did defendant's conduct contribute to the victim's injury or is the defendant "a" cause of plaintiff's harm (the casual issue)? 2) was the victim protected under a general rule or principal of law against the defendant's conduct with respect to the injury inflicted on him (the duty issue)? 3) did defendant violate a duty with respect to the victim, i.e., did the defendant act unreasonably (the negligence issue); 4) have plaintiffs sustained damages, and what is the extent thereof? Green, The Casual Relation Issue in Negligence Law, 60 Mich.L.Rev. 543, at 546 (1962).

i. Causation

As set out hereinabove (I., A., iii), it is clear that the defect in the crossing signal was a cause of Kerry Trabeau's death.

ii. Duty

The questions to be answered here are: 1) did the defendant owe the victim a legal duty and 2) did this duty include avoidance of the particular risk of injury to which the victim was exposed. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Jones v. Robbins, 289 So.2d 104 (La. 1974); Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970).
Defendant, ICG, takes the position that there is absolutely no requirement that there even be flashing signals at the railroad crossing in question. Based on this premise, the Court can only conclude that defendant further believes that once it installs such a warning system, as we have in this case, that defendant has no duty to properly maintain its system. This Court disagrees with such a position. Once the warning system is installed there is certainly a duty on defendant to properly maintain and operate the system. Defendant's own expert, Dr. Dart, testified as to the necessity of maintaining the integrity of the warning system and the negative effect on the *1387 motoring public when the system sends out a false signal.
Secondly, it is opinion of this Court that this duty to have warning lights operate properly did encompass the risk of a truck/train intersectional collision and the resulting death of Mr. Trabeau.
It is apparent to this Court that the purpose of a railroad crossing warning system is to protect against vehicle/train accidents and the encompassed risk of an improperly operating system would be a collision at the railroad crossing.

iii. Violation of Duty

In order for the plaintiffs to prevail under the theory of negligence, in addition to the requirements of proof under Louisiana Civil Code Article 2317, they must also prove that ICG had knowledge of the defect (malfunctioning warning system). Hessifer v. Southern Equipment, Inc., 416 So.2d 368 (La.App. 1st Cir.1982) writ denied, 420 So.2d 982 (La.1982). Knowledge of the defect can be actual of constructive.
Constructive notice can be shown by providing evidence that a defect was permitted to remain in its dangerous state for such a length of time as to warrant the conclusion that defendant was negligent in failing to discover it. Moorman v. State Thru Department of Highways, 384 So.2d 586 (La.App. 4th 1980).
Marcia Tureau, Lionel Prestly and Laurence Ledet all testified that they lived in the area of the accident and that the railroad warning system had been malfunctioning for the week immediately preceding the accident.
It is the considered opinion of this Court that the defendant either knew or should have known of the defective condition of the railroad crossing warning system. This opinion is based upon the Court's appreciation of the potentially (and in this case actual) deadly situation that exists when these types of warning devices malfunction, the ease with which such a situation can be prevented, and the jurisprudence of this State as set forth in Jones v. La. Dept. of Highways, 338 So.2d 338 (La. App. 3rd Cir.1976), relative to constructive knowledge. The fact that such a serious defect existed, which carries with it almost sure deadly consequences in the event of an accident, requires ICG to have and maintain a monitoring system that will insure the safety of the motoring public. To allow such a warning system to malfunction for a week without detection by the defendant is unreasonable and is considered by this Court to be a breach of its duty to the motoring public.
Finally, under the negligence issue, it must be determined if the defendant violated a duty owed to Mr. Trabeau. It is the opinion of this Court that ICG violated its duty to Mr. Trabeau in permitting its railroad crossing warning system to operate in a defective manner for a week. This the Court finds to be negligence on the part of ICG.

iv. Damage Issue

Although the Court finds ICG to be liable to plaintiffs in this matter, the Court also finds that Kerry Trabeau was negligent in the operation of his truck.
In allocating fault between ICG and Kerry Trabeau, the Court must consider the facts surrounding the accident. The facts which the Court finds most probably led to Mr. Trabeau's decision not to stop and which were beyond his control are as follows: 1) his limited view down the tracks obstructed his view of approaching trains, 2) the infrequency of trains passing through the intersection and 3) the malfunctioning warning system that had been malfunctioning for a week prior to the accident, sending out a false signal to Mr. Trabeau that a train was approaching when in fact for a week prior to the accident Mr. Trabeau had encountered no trains.
Any motorist, including Mr. Trabeau, is required to proceed cautiously when crossing railroad tracks. However, a motorist confronted with the set of facts facing Mr. Trabeau, might well assume that the crossing lights were still malfunctioning and that as in the week past, there would be no train coming even though the lights were flashing. Nonetheless, this Court finds that such an assumption can not entirely *1388 negate fault on the part of Mr. Trabeau. Accordingly, the Court allocates the respective fault of the parties (55%) on Kerry Trabeau and (45%) fault on defendant's part. Therefore, plaintiffs shall be awarded 45% of their damages.
Kerry Trabeau was twenty-six years of age when he was killed as a result of this accident. He and his wife, Debbie, had been married for 6 years and had two children, Christopher, age 3 and Megan, age 2. At the time of the trial, Mr. Trabeau would have been 33 years old.
Based upon the testimony of Dr. Melville Wolfson, a forensic economist, as of the date of trial, Mr. Trabeau had a life expectancy of 42.8 years and a work expectancy of 30.89 years.
Based upon an employment history given by John Melancon of Mel Graves, Inc., and Mrs. Trabeau, regarding Mr. Trabeau's employment outside of his truck driving, Dr. Wolfson calculated past and future loss wages of Mr. Trabeau to be $758,737.00. Dr. Wolfson went into great detail as to how he arrived at this figure and after much consideration of his testimony and the testimony of Mrs. Trabeau, relative to her husband's personal use of family income, it is the considered opinion of the Court that the sum of $758,737.00 is reasonable and the methods employed by Dr. Wolfson to arrive at this amount are based upon sound economic principals and consistent with the jurisprudence of this State.
The Trabeau family is also entitled to recover for loss of love and affection. The evidence reveals that Mr. and Mrs. Trabeau were unusually devoted to one another; that they had been married for six years and Mr. Trabeau and his wife had a very close relationship and, apart from employment obligations, the family rarely separated. Even when Mr. Trabeau played music, Mrs. Trabeau would go with him. Activities were participated in by all family members, which included regular church services, grocery shopping and recreational outings.
Apparently, the bond which was formed between this family was very strong, for as was testified to by Mrs. Trabeau's mother, even with the passage of all the years since Mr. Trabeau's death, the children and her daughter still deeply grieve the death of Mr. Trabeau.
The Court is of the opinion that an award of $200,000.00 to Mrs. Trabeau and $150,000.00 to Christopher Trabeau and $150,000.00 to Megan Trabeau for loss of love and affection is warranted under the exceptional circumstances presented in this matter and is in line with prior jurisprudence.
In summary, the award to the plaintiffs are as follows:

Loss wages $ 758,737.00
Loss of love and affection
(Mrs. Trabeau) 200,000.00
Loss of love and affection
(Christopher Trabeau) 150,000.00
Loss of love and affection
(Megan Trabeau) 150,000.00
 _____________
 $1,258,737.00

These total damages must be reduced by the percentage attributable to Mr. Trabeau's comparative negligence. Since the Court has found Mr. Trabeau 55% negligent, the total award due plaintiffs is 45% of $1,258,737.00 or $566,431.65.

III. INTERVENTION
The Court will render judgment in favor of intervenor, Aetna Casualty and Surety Company for 45% of the compensation benefits it has paid to the Trabeau family. Scott v. Barclay's Amer. Leasing Service, 506 So.2d 823 (La.App. 1st Cir.1987).

IV. EXPERT WITNESS FEES AND COSTS
The Court will assess the following expert witness fees:

Dr. Melville Wolfson $ 750.00
Al Gonzales 650.00

Costs of Court and all expert fees are taxed to defendant, ICG.
The Clerk of Court is hereby instructed to file these Reasons for Judgment in the *1389 minutes of this Court and judgment is to be prepared by counsel for plaintiffs. Judgment in accordance herewith shall be signed upon presentation.
Gonzales, Louisiana, this 26th day of October, 1987.
/s/ John L. Goldsmith JOHN L. GOLDSMITH, JUDGE 23RD JUDICIAL DISTRICT COURT