602 So.2d 1032 (1992)
Jeanette EASTON, Individually,
v.
CHEVRON INDUSTRIES, INC., Grove Manufacturing Company, Inc. and Head & Engquist Equipment, Inc.
No. 90-CA-1741.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1992.
Writ Denied October 2, 1992.
*1033 Wendell H. Gauthier, C. Scott LaBarre, Gauthier & Murphy, Metairie, for Jeanette Easton.
Michael R.C. Riess, House, Looney, Golden, Kingsmill & Riess, New Orleans, and Joseph W. Looney, Adams and Reese, New *1034 Orleans, for Chevron U.S.A., Inc. and Chevron Industries, Inc.
Thomas W. Lewis, Charles A. Boggs, Boggs, Loehn & Rodrigue, New Orleans, for Head & Engquist Equipment Co., Inc. and St. Paul Fire and Marine Ins. Co.
William F. Grace, Jr., Marc G. Shachat, Kenneth J. Servay, Douglas L. Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for Kidde, Inc. (Grove Mfg. Co.) and Nat. Union Fire Ins. Co. of Pittsburgh, Pa.
Before BARRY, WARD and ARMSTRONG, JJ.
WARD, Judge.
Jeannette Easton filed suit for the wrongful death of her husband, Amos Easton, who died on May 23, 1986 in an industrial accident while operating a large mobile crane owned by Chevron Industries, Inc. Easton, an employee of Chevron, was learning to operate the crane under the tutelage of Raymond Constant, his supervisor at Chevron. While Easton was operating the crane it began to turn over, and after he jumped from its cab it fell upon him. His widow sued Chevron and Constant, alleging that Constant as Chevrons's employee, acted in such a grossly negligent manner that his actions amounted to an intentional tort, for which Chevron and Constant are liable.
In addition to Chevron and Constant, Mrs. Easton sued the manufacturer of the crane, Grove Manufacturing Company, Inc. and its insurer, National Union Fire Insurance Company. She also sued the seller of the crane to Chevron, Head and Engquist and its insurer, St. Paul Fire and Marine Insurance Co., Inc. She alleges Grove manufactured a defective product, defective primarily because of the absence of warnings about tipover instructions and what an operator should do. She combined allegations of strict liability with allegations of negligence for failure to warn.
She alleges Head and Engquist sold a crane with the defects described above and also that they were negligent in training Chevron employees in the operation of the crane. As an incidental demand Head and Engquist sued National Union claiming it owed Head and Engquist a defense and indemnification.
Mrs. Easton settled her claims against Chevron and Constant. Chevron agreed to pay all death benefits provided by Louisiana worker's compensation law, Mrs. Easton agreed to dismiss her suit for intentional tort damages against Chevron and Constant. Chevron then reentered the lawsuit as an intervenor to recover worker's compensation payments.
Mrs. Easton went forward with her tort claims against the remaining defendants, Grove Manufacturing and Head and Engquist. Grove Manufacturing and Head and Engquist have the same interest as their insurers, and they alone, not their insurers, will be referred to as defendants hereafter, except when discussing the third party demand.
The case was tried before a jury. The trial court instructed the jury that it must not consider the fault of any party other than the defendants, Grove Manufacturing and Head and Engquist, and the court refused to permit the jury to consider the fault of Raymond Constant or the liability of Chevron as Constant's employer. The jury found the defendants at fault, and rendered a verdict favorable to Mrs. Easton and against both Grove Manufacturing and Head and Engquist. In compliance with the instructions of the trial court, the jury apportioned fault between Grove Manufacturing and Head and Engquist, holding Grove 55% at fault, and Head and Engquist 45% at fault. The trial court made the jury verdict the judgment of the court, and at the same time recognized Chevron's statutory right as an intervenor to recoup from the judgment the amount it paid as worker's compensation death benefits. That same statute gives Chevron priority for payment.
The defendants argue that the trial court made several erroneous rulings which led the jury to incorrect findings of fact. As to evidentiary rulings they contend the trial court erred by permitting evidence of other accidents to go to the jury, and by instructing *1035 the jury that it could not consider the fault of Raymond Constant when apportioning fault under comparative negligence. Continuing, they argue that as a consequence of this error, they will be held wholly liable although the major fault, if not all, was the gross negligence of Constant and Chevron. They point out the injustice of permitting Chevron to recoup its worker's compensation payment so that Chevron escapes any financial responsibility for the death of Easton, although it was by far the most culpable, because of Constant's gross negligence.
The jury, they argue, erred by finding that defendants were liable in any way, and they also contend the jury erred by awarding excessive damages for Amos Easton's death.
As a collateral issue, Head and Engquist has appealed the trial court's decision rejecting its claim that National Union Insurance company must provide it a defense and indemnification if it is held liable. This issue largely turns on the interpretation of an insurance policy issued to Grove Manufacturing and the liability of the defendants.
On the following facts the jury found Grove Manufacturing and Head and Engquist liable for the death of Amos Easton. Chevron purchased the Grove crane, an RT 420, from Head and Engquist Equipment Company, and after some negotiations Head and Engquist agreed to provide operator training to Chevron employees at the Barataria facility. A Head and Engquist instructor conducted an eight hour training session which consisted of classroom instruction  lecture, slides, printed matter supplied by the manufacturer, and hands-on training. Easton's supervisor, Raymond Constant, who had previous experience operating fixed, or "stiff leg" cranes, attended class; Easton, however, did not.
Easton was employed by Chevron as a roustabout. Chevron considered Easton a very promising diligent employee, with a bright future in the company, and gave him the opportunity for training so that he would shortly have an opportunity to be a supervisor. Part of Easton's training as a roustabout required that he learn to operate heavy equipment. On the day of the accident Easton and his supervisor were walking through Chevron's pipe and equipment yard at Barataria, Louisiana, when Easton observed the Grove mobile crane and inquired about it. Constant offered to show him how it worked. Although Easton indicated he had some experience with cranes, he had never operated a mobile hydraulic crane. Easton sat in the cab crane while Constant stood on the crane's ladder because the cab could accommodate only one person. Constant reviewed the controls with Easton and instructed him how to extend, retract, raise, lower and rotate the boom. The crane was stationary and there was no load on the boom. The "outriggers", hydraulically operated stabilizers, were not extended; thus, the crane was resting on its tires, which the manufacturer refers to as "on rubber." As Easton rotated the boom slightly to the left and extended it, the crane began to tip. Constant advised Easton to retract the boom; but Easton could not do it. Constant jumped from the crane and escaped. Easton did not. Before Constant jumped to safety, he told Easton to stay in the cab. Easton, however, instinctively attempted to jump and was crushed beneath the crane when he could not get clear of it and it fell upon him. Easton died two hours later. As it turns out Constant had neglected to tell Easton to extend the "outriggers" on the crane, the large hydraulic legs that jack up the crane, lifting its rubber tires off the ground, so that the crane's weight rests on these legs rather than on the rubber tires which are unstable.
To summarize Ms. Easton's argument that the manufacturer of the crane is liable, she contends that Grove Manufacturing placed into commerce a defective product, its crane. She reasons it was defective because it did not have a load moment indicator, a safety mechanism which gives an audible signal when either the crane is overloaded or the boom's movement will cause the crane to capsize. This was sold as optional equipment. Another defect she contends caused her husband's death was *1036 the lack of warning about the danger that a crane may tip over and the failure to advise the operator to stay inside the cab in that event. As to the seller of the crane, she argues that Head and Engquist placed into commerce a defective machine, for the reasons described above, and she also claims that Head and Engquist were negligent in their training of Chevron employees in the operation of the crane.
To summarize the defense, Grove Manufacturing and Head and Engquist deny that the crane was defective for any reason. They point out that the cab of the crane contains instructions that operators must read the operating manual before beginning to operate the crane. They also show that their operating manual, called "Operator's and Safety Handbook", is a model of clarity, its warnings impressive, with cautions about operations and admonitions that safety comes first. It warns of the danger of tip overs, Handbook page 2-65, and it tells the operator what to do when a tip over begins, page 2-66. The warnings were few, but it was emphasized that any operator must first read the manual before operating the crane.
They also contend that even if the warnings of the manual were insufficient, the failure to give clear warnings in the manual were not the cause of the accident because neither Constant nor Easton read the manual in spite of the warnings in the cab which cautioned against operating the crane without first reading the safety manual.
Head and Engquist as the seller contends the training class it conducted was more than adequate, and that it was not negligent in the way it taught how to operate the crane. And they make another argument as to cause in fact  even if the training was deficient, it did not matter, it did not cause the accident because Easton did not attend the school.
Turning to the evidence, experts testified for both sides. Those for the plaintiff testified the warnings were insufficient, those for the defense testified they were adequate and safe. An expert for the plaintiff testified that a load movement indicator sold as an accessory would have given notice of the danger and saved Easton's life. An expert for the defendant testified that the most important safety device is the rear axle oscillation lockout, a safety mechanism which automatically locks the rear wheels to improve stability anytime the boom is moved more than six degrees off dead center. He said that either Constant or Easton had manually disengaged it, and without it the load movement indicator is useless.
The jury findings appear inconsistent. Although the jury found the crane was unreasonably dangerous, it concluded that the cause of Easton's death was the failure to warn of the tip over conditions, and the failure to advise the operator of what to do if the crane does begin to tip. It found Head and Engquist negligent by giving inadequate training and operating instructions to Chevron's employees who attended their class. The jury awarded damages of $1,200,000 to Mrs. Easton, ignored the fault of any other party, and apportioned 55% of the negligence to Grove Manufacturing and 45% to Head and Engquist.
Grove's appeal has been condensed into six arguments; while Head & Engquist's appeal in considered in just two. Nevertheless, Head & Engquist joins Grove's arguments in all of their major points. In addition Head & Engquist appeals the dismissal of its ancillary demand for a defense from Grove's insurer, National Union.
First, Grove argues it did not breach a duty to warn. Grove maintains that Easton's tipover resulted from an unforeseeable misuse of the crane, his failure to read all posted warnings and the contents of the operator's manual. Additionally, it says that it "adequately warned crane operators about what to do in the event of a tipover." Grove relies upon Bloxom v. Bloxom, 512 So.2d 839 (La.1987) and Broussard v. Continental Oil Co., 433 So.2d 354 (La.App. 3rd Cir.) writ denied, 440 So.2d 726 (La.1983), for an explanation of a manufacturer's duty.
In Bloxom, supra, the Supreme Court defined a manufacturer's duty:

*1037 A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user ... In the context of a manufacturer's duty to warn of the dangers in the use of a product, the manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. [Citations omitted.] 512 So.2d at 843.
Bloxom, Grove contends, establishes a rule that failure to read the owner's manual defeats a failure to warn claim, and that in the cab of the crane there is posted a warning directing the operator to read the Grove Operator's and Safety Handbook before attempting to operate the crane.
The Bloxom case considered the danger of fire caused by the catalytic converter on an automobile. The Louisiana Supreme Court determined that the specific risk encountered in that case was small enough that a warning in the manual was sufficient because that is where an adequate warning should have been, contrary to the plaintiff's argument in favor of a warning on the sunvisor. Broussard along with several other cases considered hand tools, and holds that when a product has a number of risks, the manufacturer satisfies its duty to warn by referring the user to a manual describing those risks. Moreover, those cases dealt with problems presented by a hand tool providing inadequate space for lengthy or numerous warnings. They are not applicable.
A manufacturer must anticipate foreseeable misuse and also consider the particular hazard. When a product presents a serious risk of harm, the manufacturer must warn in a manner that is likely to catch the user's attention. See Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). The experts who testified agreed that the risk of tipover poses a serious risk of harm and for that reason a warning of this danger is required in the cab at the "point of need" because once a tip over begins there is no time to consult an operator's manual. In a remarkably similar case, the Louisiana Supreme Court in Ingram v. Caterpillar Machinery, 535 So.2d 723 (La.1988) considered the duty to warn, the breach of duty, and the absence of instructions of what to do when the tipover begins. The Supreme Court concluded there was a breach of duty to warn. It said that the danger of attempting to leave the cab was not obvious because a forklift operator cannot be expected to know from logic or experience that if the machine experiences an overturn he will suffer injury or death if he jumps but not if he remains in the cab and leans in the opposite direction. The Court went on to say it is the duty of the manufacturer to do both; that is, to inform the user of tipover danger by posting signs and to instruct the user of what to do when a tipover begins. The warning in this case was inadequate because nothing in the cab of the crane warned of or gave safety instructions in the event of tipover. The operator manual does not give instructions of what an operator should do in the event of tipover. The jury in this case could have reasonably concluded that but for the absence of a warning in the cab of the crane at the operator's "point of need" Easton would not have been killed.
Grove's second argument goes to causation. Grove contends when the jury found that its crane was not unreasonably dangerous, then there was not a manufacturing defect, and this means the jury's finding that Grove caused Easton's death is illogical and must be disregarded. Grove maintains that regardless of whether a tort claim is based on strict liability or negligence, the element of causation is the same  the alleged tort must have been a legal cause of the plaintiff's injury. Trabeau v. Mack Trucks, Inc., 543 So.2d 1381 (La.App. 1 Cir.1989) writ denied 550 So.2d 651 (La.1989).
Easton sued under theories of strict liability and negligence based upon a failure to warn. While denying any negligence, Grove forcefully argues that any alleged negligence could not have been the cause in fact of Easton's death because even if instructions *1038 about what to do in the event of a tipover were in the operator's manual Easton did not read it. The question of causation is largely factual in nature and will be upheld by an appellate court unless it is clearly wrong and unsupported by a preponderance of the evidence. Youngblood v. Sanders, 513 So.2d 521 (La.App. 2 Cir.1987). Three of plaintiff's experts testified that Grove's failure to warn caused Easton's death. Apparently, the jury chose to assign greater weight to the testimony of the plaintiff's witnesses with regard to the issue of warnings and causation. See Pernia v. Trail, 519 So.2d 231 (La.App. 5 Cir.1988) Based upon the record, we cannot conclude the jury erred in its findings.
Grove's third argument is that the trial judge erred by admitting numerous accident reports of prior tipovers involving Grove cranes. Grove sought pre-trial writs on the issue of the admissibility of the reports. (No. 89-C-2049 and 89-C-2137). In this appeal Grove raises the same arguments it advanced in its previous writ applications. Because Grove's arguments have already been considered and denied by this Court, the writ disposition made by this Court acts as the "law of the case" and precludes any further consideration of this issue. Petition of Sewer and Water Board of New Orleans, 278 So.2d 81 (La. 1973).
In a fourth argument Grove complains that the jury's lump sum award of $1,200,000 is an abuse of its discretion and therefore must be reduced. Because the verdict does not detail the particular categories of damages recoverable by the plaintiff, we must separately consider and evaluate the elements of damages allegedly sustained. Morgan v. Liberty Mutual Insurance Co., 323 So.2d 855 (La.App. 4 Cir.1975), application dismissed, 325 So.2d 282 (La.1976), overruled on other grounds, Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4 Cir.1990), writ denied 568 So.2d 1062 (La.1990).
In the "survival" action for damages sustained by Amos Easton the elements of recovery include pain and suffering, loss of earnings and other damages sustained by the victim from the time of his accident to the time of his death. Roundtree v. Technical Welding & Fabrication Co., 364 So.2d 1325 (La.App. 4 Cir.1978), overruled on other grounds by Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4 Cir.) writ denied 568 So.2d 1062 (La.1990). The "wrongful death" action includes damages to the survivor for loss of love and affection, loss of services, and loss of support (including loss of past support from the date of death to the date of trial and loss of future support from the date of trial through the duration of the decedent's work-life expectancy). Id.
In assessing quantum for a decedent's pre-death pain and suffering, the Court must consider both the severity and duration of the injury preceding death. Bickham v. Airlie Corp., 468 So.2d 658, 661 (La.App. 4 Cir.1985). Dr. Frank Rizza, who treated Easton in West Jefferson General Hospital's emergency room, recounted Easton's injuries as multiple broken ribs, a large scalp laceration and other painful internal injuries resulting from the crush trauma. Moreover, Dr. Rizza testified he could not administer any pain medication to Easton as to do so would have decreased his survival chances. Easton was conscious for two hours following the accident, and from Mrs. Easton's testimony describing his comments to her while in the emergency room, he was in acute mental distress as a result of his appreciation of his circumstances. He endured unrelieved pain and suffering for two hours. Under these circumstances an award of $100,000 is appropriate.
As to Mrs. Easton's claim for loss of love and affection, the jury heard testimony from Mrs. Easton and other family members that the Eastons' 10 year marriage was very solid and loving. An award of $100,000 to $300,000 is within the discretion of the trier of fact. Hellmers v. Dept. of Trans. & Development, 503 So.2d 174 (La.App. 4 Cir.1987) writ denied 505 So.2d 1141 (La.1987).
*1039 The loss of support award in a wrongful death action has two components: loss of support from the date of death to the date of trial, and the loss of future support from the date of trial. Roundtree, supra. A finding as to the measure of damages will not be disturbed on appeal unless the fact finder abused its much discretion. Scott v. Hospital Service Dist. No. 1 of the Parish of St. Charles, 496 So.2d 270, 274 fn. 11 (La.1986). The plaintiff's expert economist, Dr. John Chisholm, testified that the present value of Mrs. Easton's total loss of support amounted to $1,018,123.21, consisting of $126,147.49 in loss of past support and $891,975.21 in lost future support. These figures were based on an average income of $36,466.84 and a work life expectancy of 28.3 years as derived from the U.S. Department of Labor Tables for all American males. Dr. Chisholm explained he averaged Easton's income for two years prior to 1986 together with an annualized figure for 1986. He used this formula because Easton was a relatively young man whose early earning history was of little assistance in the calculation of future wages. Dr. Chisholm utilized gross wage figure in all his calculations, and employed a 6% discount figure and a 6% inflation figure. Grove's expert witness calculated Easton's past loss of support from the date of the accident until trial as $44,122 and calculated the present value of the future loss of income as ranging between $176,376 and $233,976. In all likelihood the jury accorded more weight to Dr. Chisholm's testimony.
Considering the facts of this case the jury could have reasonably awarded Mrs. Easton $1,018,123.21 for total loss of support and no matter how the jury arrived at the amount of $1,200,000, its decision is supported by the evidence and well within its discretion. C.C. art. 2324.1. We affirm the $1,200,000 award.
Grove's fifth argument goes to a ruling of the trial court when it refused to permit the defendants to submit interrogatories to the jury concerning the alleged fault of Amos Easton and Raymond Constant. At the close of all of the evidence, the trial judge refused to submit the issue of comparative fault to the jury, stating that there was "not a shred of evidence of victim fault in this case". We agree with the trial judge's conclusion. Easton was under the supervision of his immediate supervisor doing work assigned by him and responding to his commands in the individual training situation. A trial court is bound to instruct the jury only on the law which pertains to the evidence adduced in that particular case. Jackson v. West Jefferson General Hospital, 245 So.2d 724, 727 (La.App. 4 Cir.1971). Where the evidence will not support a finding of contributory fault, the trial judge does not err in refusing to instruct the jury on contributory negligence. McQuarters v. Zegar, 466 So.2d 579, 581 (La.App. 5 Cir.1985). We find no error in the lower court's refusal to charge the jury on Easton's comparative fault.
A part of Grove's argument here is appealing but we must reject it. Grove correctly observes that there was evidence from which the jury could have found fault on the part of Raymond Constant and Chevron. However, their fault was rendered irrelevant for the purposes of apportioning fault under La.C.C. arts. 2323 and 2324 by the trial court's correct conclusion that Amos Easton was not at fault. Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3 Cir.1985) writ denied, 481 So.2d 1330, 1331 (La.1986). An employer's fault can have no effect whatsoever on a third-party tortfeasor's liability to a plaintiff employee. Franklin, supra. In Melton v. General Electric Co., Inc., 579 So.2d 448 (La.1991), the Court held that there was no statutory basis for submitting the issue of employer fault to the jury for comparison where the employer is statutorily immune from fault under worker's compensation. See also Guidry v. Frank Guidry Oil Company, et al., 579 So.2d 947 (La.1991) in which both the employee and employer were at fault, yet the Supreme Court determined that the trial court erred in requiring the jury to assess and compare the fault of the employer with a third party *1040 tortfeasor. The Supreme Court cited Franklin, supra, as authority.
Defendants argue for the application of another approach, particularly that of the minority view in Guidry, supra. They point out the inequity that results from not considering the immune employer's fault when comparing fault with a third party tortfeasor. They argue that this is vividly illustrated in the present case, where even if they were negligent to some degree, the overwhelming negligence and cause of Easton's death was the gross negligence of Chevrons's employee, Raymond Constant. However, because of Melton, Chevron, as an employer, is insulated from an assessment of fault, and the third party tortfeasor is deprived of any right to seek contribution from the employer. See generally, Gifford v. Aurand Manufacturing Company, 207 So.2d 160 (La.App. 4 Cir.1968), writs denied, 252 La. 113, 209 So.2d 41 and 252 La. 115, 209 So.2d 41 (1968); LeJeune v. Highlands Insurance Company, 287 So.2d 531 (La.App. 3 Cir. 1973), writ denied, 290 So.2d 903 (la.1974). Additionally, an employer no matter how much it is responsible for the damages, may intervene in an employee's tort suit to recoup worker's compensation benefits paid the employee. The consequences of all of this is that Chevron will be reimbursed for all of its payments, it will not suffer monetary loss, and two minor tortfeasors will pay all of the damages. This may be appealing, but the dissent is not the majority, and Melton and Guidry are controlling.
The first error argued by Head & Engquist is legal causation. Head & Engquist contends its "training familiarization" class played no part in Easton's death. Easton did not attend the class. While Head & Engquist is correct in its assertion Easton did not attend its training class, Easton's supervisor, Raymond Constant, did. Constant testified that the Head & Engquist class did not give information about tipovers or what to do when one occurs. We believe the jury could conclude that the risk of crane tipover was within the scope of Head & Engquist's duty to provide adequate warning of this in its "familiarization" session and the jury may have also concluded that supervisors in the class would instruct other employees of dangers, if only they were first instructed by Head and Engquist.
The last issue in dispute is Head & Engquist's third party demand against Grove's insurer, National Union, for insurance coverage and defense. National Union provided $5 million in product liability coverage to Grove as manufacturer of the crane. St. Paul Fire and Marine Insurance afforded Head & Engquist $500,000 of primary "comprehensive general liability coverage" and excess "garage liability coverage." In a third party demand and later in motions for summary judgment or declaratory relief, Head & Engquist and St. Paul sought indemnification and defense from National Union based on a vendor's endorsement in the National Union policy. Head & Engquist and St. Paul appeal the denial of their third party demand. That demand is based on a vendor's endorsement, providing coverage when a seller incurs liability by selling one of Grove's products.
Head & Engquist asserts that the endorsement applies because it "... became involved in this litigation solely as a result of the fact it sold the crane ... and ... conducted a familiarization class". We do not agree with Head & Engquist's assertion.
In American White Cross Laboratories, Inc. v. Continental Insurance Co., 202 N.J.Super. 372, 495 A.2d 152 (1985), the court interpreted an identical vendor's endorsement and concluded that it was intended to protect a distributor or seller of a defective product who is held "strictly liable" to an injured party even though that seller is "merely a nonculpable accessory in the eventual sale." 495 A.2d at 156. However, the court also held that an independently negligent vendor is not entitled to the same coverage afforded the manufacturer. See also, Dominick's Finer Foods, Inc, v. American Manufacturer's Mutual Insurance Co., 163 Ill.App.3d 149, 114 Ill. Dec. 389, 391, 516 N.E.2d 544, 546 (1987) *1041 holding that an identical endorsement in Coca-Cola's products liability policy did not insure a food store against injury to a worker who slipped and fell on the food store's loading dock while delivering Coca-Cola products.
From the case law it appears National Union's endorsement might afford Head & Engquist coverage as an additional insured if this vendor had been found "strictly liable" simply for selling the Grove crane. However, in addition to a strict liability claim, Mrs. Easton advanced a claim that Head & Engquist was negligent in its training of Chevron personnel in the operation of the crane. It was the latter theory under which the jury held Head & Engquist accountable for Easton's death. Moreover, separate contractual agreements with Grove and Chevron indicate that Head & Engquist assumed the responsibility for training Chevron employees in the use of the crane independently from Head & Engquist's status as vendor. Considering the foregoing, Head & Engquist cannot avail itself of coverage under the Union National policy.
As for a duty to indemnify and defend, Head & Engquist and St. Paul argue that both the St. Paul/Head & Engquist policy and National Union/Kidde (Grove) policies provide "excess" coverage, and, therefore, National Union must bear a portion of Head & Engquist's loss in this litigation. They rely on Dean v. State Farm Mutual Auto Insurance Co., 518 So.2d 1115 (La.App. 4 Cir.1987), writ denied, 522 So.2d 1096 (La.1988), where this Court held that if two policies provide excess coverage and contain nearly identical "other insurance, excess clauses," the insurers should share liability on a pro-rata basis. More particularly, Head & Engquist and St. Paul contend that Easton's casualty is an incident arising from the "sale" of the crane and is therefore with St. Paul's "Garage Liability Policy" which provides $500,000 excess coverage on vehicles not owned by Head & Engquist. They rely on Endorsement 10 of the St. Paul policy which states that an occurrence arising out of the "rental or lease of equipment" is covered under the primary Comprehensive General Liability Coverage, whereas an accident or occurrence arising out of the "sale" of equipment is covered under the excess Garage Liability Coverage Policy. These arguments are without merit because the National Union policy provides expressly only excess coverage while the St. Paul policy provides primary coverage. Therefore, since the two policies do not cover on the same basis, no pro-rata division applies.
In Louisiana, "an excess insurer does not owe its insured a defense of a claim within a primary insurer's limits". Lumbermen's Mutual Casualty Co. v. Connecticut Fire Insurance Co., 239 So.2d 472, 474 (La.App. 4 Cir.), writ denied, 256 La. 1157, 241 So.2d 255 (1970). "[A]n excess insurance policy provides coverage that begins only after a predetermined amount of primary coverage is exhausted." Steve D. Thompson Trucking, Inc. v. Twin City Fire Insurance Co., 832 F.2d 309, 310 (5th Cir.1987).
Second, St. Paul's policy provided Head & Engquist with primary, not excess insurance. As discussed previously, Mrs. Easton's claim did not arise from the sale of the crane covered under the St. Paul garage policy, but rather arose from Head & Engquist's negligence in failing to train Chevron employees in the safe use of the crane, which falls under the general comprehensive liability coverage of the St. Paul policy which provides primary coverage.
The "other insurance" clause of the St. Paul policy reads:
Other Insurance. This agreement is primary insurance. If other insurance is available that is excess or contingent, it won't affect our payment under this agreement.

Excess insurance applies after primary coverage has been used up.... [Emphasis added.]
Additionally, the St. Paul policy provides for defense of lawsuits arising under its policy:
Defending Lawsuits. We'll defend any suit brought against you or any other protected person for covered claims, even if the suit is groundless or fraudulent....
*1042 We also note that the distributor sales and service agreement executed by Head & Engquist and Grove stipulated that Head & Engquist would provide its own insurance, further indication that Head & Engquist is not entitled to a defense or indemnification from Grove or its insurer.
For the foregoing reasons, the judgment of the lower court is affirmed in all particulars.
AFFIRMED.