# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-446


DINO VINCENT TUMINELLO, SR. AND TIFFANY TUMINELLO

VERSUS

ABC INSURANCE COMPANY; EPIC ENTERTAINMENT, LLC
D/B/A EPIC ENTERTAINMENT AMUSEMENT PARK; AND
KEITH E. GALLOWAY


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20183255
HONORABLE MICHELLE M. BREAUX, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Gary J. Ortego, Judges.


**AFFIRMED IN PART;
REVERSED IN PART.**

**Blake R. David**
**Reed K. Ellis**
**Robert B. Brahan, Jr.**
**Broussard & David**
**P.O. Box 3524**
**Lafayette, LA 70502-3524**
**(337) 233-2323**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Dino Vincent Tuminello, Sr.**
    **Tiffany Tuminello**

Robert D. Felder
James H. Domengeaux, Jr.
Jami L. Ishee
Davidson, Meaux, Sonnier, McElligot, Fontenot, Gideon & Edwards, LLP
810 South Buchanan Street
Lafayette, LA 70502-2908
(337) 237-1660
COUNSEL FOR DEFENDANTS/APPELLEES:
      Neveplast USA, LC
      Nautilus Insurance Company

Scott C. Barney
Keith C. Armstrong
Joseph R. Dronet
Chaffe, McCall, L.L.P.
8550 United Plaza Boulevard, Suite 103
Baton Rouge, LA 70809
(225) 922-4300
COUNSEL FOR DEFENDANT/APPELLEE:
      PERI Formworks Systems, Inc.

Jessica Duhoffman
Miles & Stockbridge, P.C.
1001 G Street NW, Suite 1100
Washington, DC 20001
(202) 655-4163
COUNSEL FOR DEFENDANT/APPELLEE:
      PERI Formworks Systems, Inc.

Gregory T. Stevens
Kevin W. Welsh
Jordan P. Zeringue
Phelps Dunbar, LLP
II City Plaza/400 Convention
Baton Rouge, LA 70802
(225) 346-0285
COUNSEL FOR DEFENDANT/APPELLEE:
      BigAirBag, BV
Steven W. Geiger
Emily E. Eagan
Geiger, Laborde & Laperouse
701 Poydras Street Suite 4800
New Orleans, LA 70139
(504) 561-0400
COUNSEL FOR DEFENDANT:
      Neveplast SRL

**GREMILLION, Judge**.

Plaintiffs, Dino and Tiffany Tuminello, appeal the trial court's grant of summary judgment in favor of the Defendants, Neveplast USA, LC and PERI Formwork Systems, Inc. For the following reasons, we affirm in part and reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND

The Tuminellos filed suit against Epic Entertainment, LLC and its owner, Keith Galloway, in May 2018, alleging Dino suffered significant injuries in early November 2017, at Epic Entertainment Amusement Park in Scott, Louisiana after Dino landed on his head on a large air bag as he exited the "Thunder Roll" slide at the Epic amusement park. The "Thunder Roll" was named by Galloway but is a standard model "TUBBY Jump" offered for sale by Neveplast USA; the slide components are manufactured by the Italian company, Neveplast SRL. The slide is about forty feet high and consists of scaffolding provided by PERI upon which Neveplast's artificial snow slide materials are placed. A rider sits on an inner tube as he descends the slide, exits the "kicker," and lands on an airbag.

The Tuminellos alleged claims under the Louisiana Products Liability Act, La.R.S. 9:2800.51 et seq. and general negligence claims. The Tuminellos filed six supplemental and amending petitions adding various defendants. Extensive pleadings were filed by the parties over the years leading up to the hearing on the exceptions and motions for summary judgment.

Neveplast USA's May 2020 motion for summary judgment had ten exhibits attached to it: Neveplast Rules and Regulations for TUBBY Tracks/TUBBY Jump Slides; BigAirBag Manual; waivers executed by Plaintiffs; the deposition of Ryan Locher; the deposition of Keith Galloway; the deposition of Andrew Mullins;

excerpts from the deposition of Dino Tuminello; excerpts from the deposition of Tiffany Tuminello; cell phone video of the Tuminello accident; and, Plaintiffs' petition, as amended. Neveplast USA argued that there was no genuine issue of fact that Epic used Neveplast materials directly contrary to its protocols, procedures, warnings, and training, including those relating to rules about moisture, testing, and the requirement that the slide be shut down when wet.

The Tuminellos filed an opposition to Neveplast USA's motion for summary judgment in July 2020, arguing that Neveplast USA's claim that the slide was wet was not supported by any evidence. The Tuminellos claimed that the only evidence presented was that the airbag had water droplets bouncing off of it; it was humid the evening of the accident but did not rain. The affidavit of William Avery, a ride expert, was attached. Avery determined that Neveplast USA knew or should have known of the danger that riders would rotate backwards and flip upside down, that it failed to warn users of said event, and that its manuals and paperwork were devoid of any instruction regarding this issue.

In December 2022, Neveplast USA filed a peremptory exception of no cause of action as to the Tuminellos' claim of solidary liability, arguing Louisiana only uses a comparative fault system, even under LPLA claims. Neveplast USA also filed a peremptory exception of no cause of action and no right of action, and alternative motion for partial summary judgment as to improper simultaneous claims, urging that negligence and products liability claims cannot be cumulated and requesting partial summary judgment on the general negligence claims asserted by the Tuminellos. Neveplast USA also filed individual motions for partial summary judgment dismissing the Tuminellos claims under La.R.S. 9:2800.55, La.R.S. 9:2800.56, La.R.S. 9:2800.57, and La.R.S. 9:2800.58

On December 28, 2022, PERI filed a motion for summary judgment arguing that it had no involvement in the design, manufacture, supply, installation, training, or operation of the attraction, the kicker ramp, or airbag that allegedly caused Dino's injuries. It further argued that the scaffolding PERI provided was not the cause of Dino's injuries and was not alleged to be unreasonably dangerous or defective in any way.

On January 17, 2023, Plaintiffs filed an opposition to Neveplast USA's motion for summary judgment arguing that their LPLA and negligence claims could co-exist and, alternatively, if the court ruled that Neveplast USA was not a manufacturer, genuine issues of material facts precluded summary judgment as to its negligence. They attached the expert affidavit of Edward M. Pribonic finding that Neveplast failed to provide Epic with proper maintenance instructions, that Neveplast did not comply with ASTM standards by testing the slide prior to its sale to Epic or during the installation, that the Neveplast airbag provided a defectively designed and constructed inflatable amusement device, the Neveplast airbag did not undergo a device analysis or risk assessment, design defects in the airbag contributed to Dino's injuries, and the airbag was unreasonably dangerous and defective. They also attached the affidavit of William Avery finding that Neveplast knew or should have known of the danger that riders would slide to rotate backwards and flip upside down; Neveplast failed to properly warn users of the danger; Neveplast's manuals, training and warnings were silent on the danger of over-rotation; and, Neveplast failed to properly warn of the danger of landing in the head-first position.[1]

---

[1] Avery's report does not distinguish between Neveplast USA and Neveplast SRL using only "Neveplast."

Following a March 27, 2023 hearing, the trial court signed a judgment on April 12, 2023, that granted motions for partial summary judgment filed by Neveplast USA and dismissed Plaintiffs' claims under all four prongs of the LPLA. The trial court sustained Neveplast USA's peremptory exception of no cause of action and no right of action as to improper simultaneous claims and dismissed all remaining claims, including general negligence claims, and granted PERI's motions for summary judgment.

The Tuminellos timely appealed and assign as error:

1. The trial court legally erred when granting the peremptory exception of no cause of action for Plaintiffs' general negligence claim against Neveplast USA.

2. Alternatively, the trial court legally erred by summarily dismissing Plaintiffs' claims pursuant to the LPLA Act pending against Neveplast USA and Peri when abundant genuine issues of material facts [sic] exists.

**DISCUSSION**

The depositions of Ryan Locher and Andrew Mullins were attached in support of the motions for summary judgment.

*Ryan Locher*

Ryan Locher testified that he is the sole U.S. representative for Neveplast. He created Neveplast USA, LC in 2005, after the ski resort he worked at asked him about getting a Neveplast slide installed. He said there are approximately 300 Neveplast slides in the United States ranging from ski areas, the Smithsonian Zoo, and smaller amusement parks like Epic. He said some locations have 80 feet of Neveplast material while others have 2200 feet of material. Nearly 90 percent of the slides are installed on natural terrain like hills. Locher said Neveplast sells "an artificial snow surface" consisting of the plastic product that resembles snow, the

4

tubes, the sliding agent, and the kicker ramp. Locher testified to the mechanics of a Tubby Jump slide installation.

Q. Is part of what you sell the design of the various jumps?

A. We provide a template. Our template is standard for the TUBBY Jump and the skiing side of things. It's a standard template that we have not changed. It's been the same template from the beginning that we provide to our clients, and from there, you know, they--or we don't get involved in the structure piece of things. We out--they usually--you know, such as in Keith Galloway's situation, you know, we gave him some people that we've worked across in Europe, as well as in the United States, that we've used in the past for scaffolding. Peri and Layar were two of the examples that we gave him, and, you know, we don't get involved from that aspect on.

Q. Are you all ever asked to be involved in that aspect of it?

A. I would say so, but we never have, never will. It's just not our business. We sell the plastic product, what we slide on, and the structure piece we always give to--you know, for them--give them information that they can run with and they take it from there.

Q. Okay. And what about the tubes? You sell those?

A. Tubes we make. We make tubes, yeah, the whole structure of the tubes. . . .

Neveplast USA also provides the sliding agents. Locher further testified:

Q. And what about the kicker ramp?

A. We manufacturer [sic] that as well. It comes out of our home office in Italy. Everything. All the material comes out of our home office in Italy.

Q. And the same sort of question about the kicker ramp. You all offer just one or are there--

A. Just one.

Q. Okay. And what's unique about that kicker ramp? Why do you all manufacture that part but not the rest of the stretcher?

A. Just because we--you know, between the testing that Neveplast SRL has done in the past, they know the exact, you know, what it needs to be to--you know, that template that we give, that's kind

5

of [a] complete--not a complete package, but it's a --something they've tested and know that that works for them.

Locher described the TUBBY Jump (the model of the slide named "Thunder Roll" by Galloway) as consisting of:

> side rails, a left and right side rail. You have bands that go across that hold it horizontally together. So everything is pre-drilled. It's nuts and bolts. And that's basically it. On top of that, you have plastic on the side rails. You have protective padding on each side rail that in case somebody puts their leg down or whatnot, they're not getting--you know, they're not touching the plastic. Then we sell the Np 30, which is the plastic that you're sliding on. That is the same process, same standard material from any straight lane that we would sell.
>
> . . . .
>
> The kicker is the same concept kicker that they developed. That hasn't changed. You know, it's all steel structure that has kind of structural bands that go across that support our material and that's just, you know, steel. That's basically it.

Locher said the kicker is part of the TUBBY Jump slide assembly. The air bag is not, but the ride requires an airbag. While there are other airbag manufacturers, Neveplast has partnered with BigAirBag and used them exclusively.

Locher said each location has different needs and once a location provides their inclination, the Neveplast R&D team in Italy makes the CAD file, the top view and side view of the template. Locher said: "If it's too steep, if they need any grade work, you know, we'll give them our recommendation to make a safe--you know, a recommendation to make a safe kind of operation that we feel is what we would recommend." He said if they are using scaffolding, rather than natural terrain, "[I]t makes it pretty simple because they can build right to the specs of that template, the scaffolding people or the structural engineers."

Locher did testify when questioned about another slide built in Florida:

> Q. The slide that was built in Lafayette, was it modified in any way from the one in Florida?

A. It shouldn't have been.

. . . .

A. No, it should have been the standard, same design, same template that we give to anybody.

Q. So all angles would be the same?

A. Yes.

Q. All the measurements?

A. That's correct.

Q. Same height, same length?

A. That's correct.

Q. And you would use the same kicker ramp?

A. That's correct.

Locher said the TUBBY Jump has been installed all over the world on either steel, scaffolding, wood, or natural terrain such as a hill. He said grade work will sometimes be done if the slope needs to be adjusted. Locher testified that the Thunder Roll was the standard-sized TUBBY Jump, and he described his installation process:

> You know, my process when I go to do an installation is, you know, I make sure the installation is done correctly from start to finish. I usually put my hands on every piece of panel that goes onto the product or onto the scaffolding, depending where the location is. Once the installation is completely finished, I am the first person to test it or one of my employees will be the first person to test it.

> I was the first person to test every single slide at Epic. Everything was operating in a safe manner. And after that, I usually meet with Keith Galloway and his team or whoever the client is and go through all instructional and safety points related to maintenance, you know, wind, moisture, anything that could possibly happen an hour after I leave or a day after I leave, and hopefully he applies, you know that information to his operation in the future.

7

Locher said, "it wasn't rocket science," and "I landed where I needed to land. And, you know, within that you get variance in different weight sizes and, you know, from middle of day to evening, and everything seemed to be operating, you know, as should be."

Locher said he did not have any contact with PERI. He also stated that when he arrived at the Epic location, he did not do any kind of inspection of the structure to make sure it was built as it was designed or that the angles were correct according to the Neveplast SRL template. He installed the Neveplast product and that was it. He said he did not see any "red flags" that made him think anything was different.

Locher was later asked:

> Q. What I'm trying to understand is if the slide--is the slide always a certain height?
>
> A. It depends on the operation you're looking for. It's a TUBBY Jump, it should be the exact height, but we have straight lanes that land on the ground that could be a hundred feet, 300 feet, 200 feet, 800 feet. It really depends on what they're working for. Most of the scaffolding stuff is 250 feet or less just because it's such a massive structure if it goes any higher than that.
>
> Q. And the 3D image that was provided by Peri or forwarded to you prepared by Peri, that matched the length of--
>
> A. I couldn't tell. There was no lengths or measurements on that 3D imaging. There was just a screenshot of a--I believe I've seen that screenshot in some of the documents. But from my eye looking at it from just from the natural eye, it looked very similar to what we provided for the template, but I couldn't tell from a measurement side or length side if it matched our template.

Regarding differences in the as-built slide from the slide in the Neveplast SRL template, Locher testified:

> Q. Okay. And tell me one more time, what was different about the on-site construction versus what's depicted in the Neveplast drawings?

8

A. Just it's not the same angles. It's an--it's not a smooth inclination down. There's an inclination like this and then it flattens. It does this and then into a transition and then up.

Q. Okay. Was it the abruptness of the transition--of the change in angles that was at variance from the Neveplast drawings or was it the slope or was it both?

A. Both.

Q. Okay. Was the slope greater than depicted in the Neveplast drawings or less?

A. I think it's less.

Q. So it was more flat, more level?

A. Yeah, I mean, ours goes all the way down. This went-- (Gesturing).

Q. I see. Okay. And I asked you earlier. Perhaps I lost the answer. Was Peri's scaffolding material, to your knowledge, underneath the part where it didn't match the Neveplast design?

A. My understanding and my belief, it was Peri's scaffolding material.

Q. And what makes you believe that?

A. It was--Peri's scaffolding material was the only scaffolding material there, from my knowledge.

Q. Okay. Are you aware of some timber construction that was under a portion of the slide?

A. I think there was some timber construction right in the last foot or so into the transition into the asphalt just because they left a gap of, you know, eight to twelve inches there and that need--you can't have that drop, so I made them make a smooth transition from the end of Peri onto natural terrain or natural to the asphalt.

Q. This area at the last 15 feet where the transition and slope was not consistent with the Neveplast drawings, did you try to have the contractor adjust the area?

A. I did make a note saying to Keith, and we had a conversation, that it's not to the specs of our template. But there was--at that point, there was no changing it. You know, within testing, everything tested

9

fine, so there was no reason for me to think, you know, of something needed to be changed.

. . . .

Q. Okay, Did Neveplast Italy have any concerns about the actual on-site construction not meeting the design?

A. No, no, I mean, they--as long as everything was, you know, from our testing standpoint. When I tested, everything seemed to be fine in the multiple times we tested it and there was no concern per se of--in my opinion there would be no concern of making the slide faster. It at all, it lessened the inclination and lengthened it by a little bit. It would possibly slow it down, but we never saw anything, any reason to believe at that time that it would make a difference in the slide.

Locher testified that he did not even notice any difference in the as-built design from the Neveplast template until his Italian associate noted a slight difference after being texted a picture of the completed slide by Locher. Locher specifically stated that he tested the slide after installing his product on top of the scaffolding and found no issues of any kind relating to the slide.

*Andrew Mullins*

Mullins was an outdoor shift leader at the time of the incident but has no recollection of the particular day. He said he often worked at the top of the slide instructing riders on what to do and not to do and having them give a thumbs up for the camera if they agreed. Mullins said that riders were not supposed to flip or rotate at all, but it did happen from time to time; sometimes they spun in the air, sometimes they lost control of their tubes on purpose or on accident. Mullins estimated that about 40 percent of the people landed with their feet up, backs straight, and holding on to the tube as one is supposed to. Mullins did not recall anyone missing the airbag, hitting the airbag and rolling off, or any other serious injuries. He said the worst injuries he saw were a bloody nose or a rider being jarred from the landing, and that was rare.

Mullins testified that in the summer months, the slide was too slow, and riders would land too short or not get high enough; he said there was never a problem with people going too far and too high. Mullins said that a water misting machine would be used when it was extremely hot and the slide was not functioning well. In the wintertime, the slide sped up. Mullins said the park would remain open if it was just a light rain and riders were able to ride the Thunder Roll. He estimated that a sudden change in weather pattern, such as dry to wet, would make a four-to-five-foot difference in the landing area of the airbag. Having ridden the slide hundreds of times, Mullins said there was no impact to the body whether you landed in the middle or closer to one end of the airbag. He explained how the kicker was adjusted but said it had only been done a handful of times. He indicated that a two-by-four would be wedged underneath to make it easier to adjust, similar to a car jack. Mullins reviewed the video and noted that it did not appear that the misters were on, and he saw water jump off the airbag, "meaning it was a little slick out there."

***Assignment of Error One***

In this assignment of error, the Tuminellos argue that the trial court erred in dismissing its general negligence claims against Neveplast USA as an alternative to their LPLA claims. Plaintiffs further claim that "no LPLA claims even existed against Neveplast USA when the negligence claim was dismissed" because Plaintiffs' LPLA claims were dismissed before the exception was even heard.

On appeal, we review the trial court's grant of an exception of no cause of action using the de novo standard of review. *ERA Helicopters, LLC v. Amegin*, 15-753 (La.App. 3 Cir. 12/9/15), 181 So.3d 241.

> The purpose of the peremptory exception of no cause of action is to determine the sufficiency in law of the petition. The burden of showing that the plaintiff has stated no cause of action is upon the

exceptor. The public policy behind the burden is to afford the party his day in court to present his evidence. *Jarrell v. Carter*, 577 So.2d 120 (La.App. 1 Cir.), *writ denied*, 582 So.2d 1311 (La.1991). The exception is triable on the face of the papers, and for the purpose of determining the issues raised by the exception, the court must presume that all well-pleaded facts in the petition are true. All reasonable inferences are made in favor of the nonmoving party in determining whether the law affords any remedy to the plaintiff. LA.CODE CIV.P. arts. 927, 931; *Mayer v. Valentine Sugars, Inc.*, 444 So.2d 618 (La.1984). . . .

Generally, under La.Code Civ.P. art. 931 parties may introduce no evidence to support or controvert the exception. See, e.g., *Treasure Chest Casino, L.L.C. v. Parish of Jefferson*, 96-1010 (La.App. 1 Cir. 3/27/97), 691 So.2d 751, 754, *writ denied*, 97-1066 (La. 6/13/97), 695 So.2d 982.

. . . .

An exception of no cause of action is likely to be granted only in the unusual case in which the plaintiff includes allegations that show on the face of the petition that there is some insurmountable bar to relief. Thus, dismissal is justified only when the allegations of the petition itself clearly show that the plaintiff does not have a cause of action, or when its allegations show the existence of an affirmative defense that appears clearly on the face of the pleadings. [*City of New Orleans v.*] *Board of Comm'rs of Orleans Levee Dist.*, 640 So.2d [237] at 237 [ (La. 1994) ]. A court appropriately sustains the peremptory exception of no cause of action only when, conceding the correctness of the well-pleaded facts, the plaintiff has not stated a claim for which he can receive legal remedy under the applicable substantive law.

*City of New Orleans v. Bd. of Dir. of La. State Museum*, 98-1170, pp. 9-10 (La. 3/2/99), 739 So.2d 748, 755–56.

The legislature set forth its intention to limit causes of actions against manufacturers to the theories of liability found in La.R.S. 9:2800.55 et seq. when it stated in La.R.S. 9:2800.52 (emphasis added):

This Chapter establishes the *exclusive theories* of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer *for damage caused by a product* on the basis of *any theory of liability that is not set forth in this Chapter*. Conduct or circumstances that result in liability under this Chapter are "fault" within the meaning of Civil Code Article 2315. This Chapter does not apply to the rights of an employee or his personal representatives, dependents or relations against a manufacturer who is

the employee's employer or against any principal or any officer, director, stockholder, partner or employee of such manufacturer or principal as limited by R.S. 23:1032, or to the rights of a claimant against the following, unless they assume the status of a manufacturer as defined in R.S. 9:2800.53(1)[.]

*Is Neveplast USA a manufacturer?*

A threshold question in a products liability case is whether a party is a "manufacturer" under the statute. While this issue was raised at the hearings by the Plaintiffs, the trial court did not make a specific finding about Neveplast USA's status as a manufacturer. The Tuminellos note that Neveplast USA calls itself a "distributor for the European manufacturer of the artificial snow material that lines the top of the Thunder Roll." Plaintiffs argue that there is a genuine issue of fact if Neveplast USA is an alter ego of Neveplast SRL, an undisputed alien manufacturer, such that the LPLA would even apply to it, and if it does not, they could the pursue the negligence avenue of recovery. The Tuminellos argue in their reply brief, "As there is a genuine issue of material facts [sic] as to whether Neveplast USA is merely the distributor of the subject artificial snow material, the LPLA cannot be the exclusive remedy of Plaintiffs for their general negligence claims and the trial court's judgment should be reversed." We disagree. If the legislature intended for a plaintiff to have alternating theories of liability, it would not have made the LPLA the exclusive remedy for claims against manufacturers. All six of the Tuminellos' petitions allege claims falling squarely within the LPLA. In the first supplemental and amending petition Neveplast USA is added as a defendant and described as:

> E. NEVEPLAST USA, LC, a foreign corporation whose principal place of business is located in the State of Virginia – who at all times pertinent hereto manufactured, assembled, designed, planned, selected and/or created the inner-tube and landing pad for this particular slide system.

13

In their fourth supplemental and amending petition it added paragraph 11, which stated:

11.

In addition to its role as manufacturer, defendant NEVEPLAST USA, LC, through its own fault and/or negligence, caused the above described injury in the following non-exclusive particulars:

The petition then lists four claims that Neveplast USA failed to properly instruct Epic and/or its employees.

Neveplast USA is a manufacturer within the plain meaning of the statute. La.R.S. 9:2800.53 (emphasis added) defines a manufacturer as:

(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:

(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.

(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.

(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.

(d) *A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer.* The court shall take into consideration the following in determining whether the seller is the alien manufacturers alter ego: whether the seller is affiliated with the alien manufacturer by way of common ownership or control; whether the seller assumes or administers product warranty obligations of the alien manufacturer; whether the seller prepares or modifies the product for distribution; or any other relevant evidence. A "product of an alien manufacturer" is a product that is manufactured outside the United States by a manufacturer who is a citizen of another country or who is organized under the laws of another country.

14

Plaintiffs have admitted Neveplast USA is a manufacturer. It is the sole U.S. distributor of the Italian Neveplast SRL artificial snow products. Under La.R.S. 9:2800.53(1)(d), Neveplast USA is a manufacturer within the meaning of the LPLA. Thus, as a manufacturer, claims against it can only lie under the LPLA according to the plain meaning of the statute.

The Tuminellos rely on *Lavergne v. America's Pizza Co., LLC*, 02-889 (La.App. 3 Cir. 2/5/03), 838 So.2d 845, asserting that a distinction exists between damages caused by a product from damages caused by an employee's negligent use of a product. In *Lavergne*, a three-year-old was burned after a Pizza Hut employee placed a hot cup of tomato dipping sauce in front of him, which he then grabbed and spilled, causing second-degree burns. The Plaintiffs argued that the negligent placement of the heated sauce was the cause of injuries, not a defect in the sauce itself. A panel of this court held:

> Here, America's Pizza wears two hats; one as the supposed manufacturer of the sauce, and another as an employer of a potentially negligent employee. While the LPLA's exclusivity provision eliminates a general negligence cause of action for damages caused by a product, it does not eliminate the liability of a manufacturer for damages caused by the *negligent use of its product* by one of its employees. Thus, America's Pizza cannot escape its liability for the negligence of its employee by claiming to be the manufacturer of the sauce, even if it was, in fact, the manufacturer. *This is a simple negligence claim, not one under the LPLA.* We agree with the trial court's disposition of this issue.

*Id*. at 848 (emphasis added) (footnote omitted).

Notably, the appellate court affirmed the trial court's ruling dismissing the plaintiff's claims under the LPLA and awarding the plaintiff damages under a general negligence claim, which supports the exclusivity of the LPLA. The Tuminellos have not asserted any facts indicating that Neveplast USA's owner-employee, Ryan Locher, negligently used the product it distributed which resulted

15

in Dino's injuries. Locher installed the artificial snow planks some six months prior to the date of this accident and had not returned to the location since. The facts in *Lavergne* are clearly distinguishable from those before us. All of the Tuminellos' allegations fall under the four categories for which an LPLA claim has been exclusively established by the legislature. Moreover, the Tuminellos' brief falls short of alleging any facts that remove Neveplast USA from the ambit of the LPLA. Even in their reply brief, the Tuminellos' argument sets forth nothing that would subvert the LPLA:

> Ryan Locher put his hands on every single panel and oversaw the entire installation of the slide. He was also aware of the slide's deviations from the original design, and he personally approved those deviations. Locher even tested the slide himself and certified it as safe. He also sold lubricant multiple times to the slide owner after installation to make it faster. Meanwhile, both Plaintiff's experts and Peri argued that the variations in height and scope caused Mr. Tuminello's injuries. Plaintiff's experts opined that the slide's slope, height, and kicker angle were causes of Mr. Tuminello's injuries, and Peri vehemently argued that the kicker ramp was the sole cause of these injuries. At the very least, abundant evidence of Neveplast USA and its employees['] negligence exists.

Accepting all of these allegations as true and as further discussed below, Neveplast USA was the final product manufacturer of the slide, and the Tuminellos' various theories of liability fall under the LPLA. The trial court did not err in granting Neveplast's no cause of action. Accordingly, this assignment of error is without merit.

### Assignment of Error Two

In this assignment of error, the Tuminellos argue that the trial court erred in granting summary judgment in favor of Neveplast USA and PERI under the LPLA.

> The law pertaining to summary judgment was discussed by the Louisiana Supreme Court in its per curiam opinion in *Hines v. Garrett*, 04-806, p. 1 (La. 6/25/04), 876 So.2d 764, 765 (alteration in original):

16

We review a district court's grant of summary judgment de novo, viewing the record and all reasonable inferences that may be drawn from it in the light most favorable to the non-movant. Summary judgment is warranted only if "there is no genuine issue as to material fact and [ ] the mover is entitled to judgment as a matter of law." La.Code Civ.Proc. art. 966(C)(1). In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor.

"[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p.27 (La. 7/5/94), 639 So.2d 730, 751, (quoting *South Louisiana Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writs denied*, 596 So.2d 211 (La.1992) (alteration in original). A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. *Id.*

Whether a fact is material is determined in light of the relevant substantive law. *Weingartner v. La. IceGators*, 02-1181 (La.App. 3 Cir. 4/17/03), 854 So.2d 898, *writ denied*, 03-1388 (La. 9/19/03), 853 So.2d 645.

*Thibodeaux v. Circle K Stores, Inc.,* 20-540, p. 2 (La.App. 3 Cir. 5/5/21), 318 So.3d 465, 467.

Louisiana Revised Statutes 9:2800.54 sets forth when a manufacturer of a product is liable for damages caused by its product. It states:

A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product *unreasonably dangerous* when such damage arose from a *reasonably anticipated use* of the product by the claimant or another person or entity.

B. A product is unreasonably dangerous if and only if:

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

17

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

*Id.*

A product is defined in La.R.S. 9:2800.53(3), which states in part:

"Product" means a corporeal movable that is manufactured for placement into trade or commerce, including a product that forms a component part of or that is subsequently incorporated into another product or an immovable.

***Component Parts/Finished Product***

We note initially that the completed Thunder Roll is composed of more than one "product" manufactured by different parties. The scaffolding is manufactured by PERI and the slide parts are manufactured by Neveplast SRL and distributed by Neveplast USA. As previously noted, Neveplast USA is a manufacturer for purposes of the statute. Moreover, we find that the trial court did not err in granting PERI's motion for summary judgment because the Plaintiffs failed to present any evidence of a defect in PERI's scaffolding or that any variation in the scaffolding design from Neveplast SRL's template was the cause of Dino's injuries. More importantly, though:

[T]he ultimate responsibility for determining whether the end product or its components will be safe and suitable for the purpose for which it

18

is finally sold lies with the finished product manufacturer. He is held to a duty of reasonable care in selection of components, which is something more than mere inspection. His technical knowledge should be sufficient to enable him to select material, the use of which will secure a safe finished product. He should use reasonable care to ascertain the material out of which the other manufacturer's part is made and the plan under which it is made, and have sufficient technical knowledge to form a reasonably accurate judgment as to whether these are such as to secure a safe finished product. See Restatement of Torts, 2d, Sec. 395. . . . .

*Champion v. Panel Era Manuf. Co.*, 410 So.2d 1230, 1241–42 (La.App. 3 Cir.), *writ denied*, 414 So.2d 389 (La.1982).

Neveplast USA is the finished product manufacturer of the TUBBY Jump (Thunder Roll) slide. It originated the design and completed it by placing the slide parts atop the scaffolding that PERI manufactured. Neveplast USA also built the kicker ramp. While other parties were responsible for different aspects of completing the slide, including PERI, the professional engineer who stamped PERI's drawings, and the company who erected the scaffolding, Neveplast USA is responsible for the completed product, i.e., the Thunder Roll slide that existed at Epic, under La.R.S. 9:2800.53(3).

The ultimate duty rested with Locher to determine if the slide was safe and fit for use, and what effect, if any, the design variation had on the safety of the slide. Without any other evidence that a piece of the scaffolding had a design or construction defect, summary judgment was properly granted in favor of PERI.

### Construction or Composition

A manufacturer can be liable pursuant to La.R.S. 9:2800.55 if its product is unreasonably dangerous in construction or composition. Louisiana Revised Statutes 9:2800.55 (emphasis added) provides that, "A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control,

the *product deviated in a material way from the manufacturer's specifications or performance standards* for the product or from otherwise identical products manufactured by the same manufacturer."

> "This is a narrow and demanding test" because the plaintiff must show "that the *particular* product used by the plaintiff deviated from its intended design." *Guidry*, 206 F.Supp.3d at 1197–98 (emphasis in original). In other words, the plaintiff must show "what a manufacturer's specifications or performance standards are for a particular product" *and* "how the product [used by the plaintiff] materially deviated from those standards so as to render it unreasonably dangerous." *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 311 (5th Cir. 2017) (citation omitted). "A [plaintiff] must also show that the alleged defect was the cause-in-fact of his injury, as well as the 'most probable cause.' " *Rhodes*, 2019 WL 2162845, at *3 (quoting *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994)).

*Fuller v. Eisai Inc.*, 513 F.Supp.3d 710, 720–21 (E.D. La. 1/15/21) (alterations in original).

Plaintiffs argue that the "composition of this slide materially deviated from the specifications of every previous Neveplast slide." Locher testified that all of the slides are different as they are built to accommodate the environment in which they exist. For example, some are built onto mountainsides and some are built on ski slopes. However, he did state that the Thunder Roll should have been built according to the Neveplast SRL CAD drawings, and it indisputably was not. Further, he testified that this was the first "kicker" slide he had personally installed. Plaintiffs' expert, Edward Pribonic, described the slide and the kicker:

> At the lowest point of the slide, the sliding surface then transitions up a ramp of over 8 [feet] in height.[2] Mr Tuminello traveled up the kicker ramp, beyond its end point and was launched skyward at 30 mph and an angle of approximately 45 [degrees], (Fig. 3A). Upon his launch from the kicker ramp, the tube, with Mr. Tuminello still holding tightly to the handles, shot upward another 14 [inches] to 15 [inches] higher, and simultaneously rotated backwards, (Fig. 3B).

---

[2] We note that Pribonic's report used the sign for inches and feet inversely throughout his report, but we use the correct measurement in brackets.

After reaching the peak height, the tube and Mr. Tuminello began to fall toward the air bag, and continued to rotate, (Fig. 3C). Ultimately the tube rotated with Mr. Tuminello's head directly downward when he impacted the air bag. Upon impact, Mr. Tuminello sustained multiple neck and spine injuries.

Plaintiffs make various allegations that a "height increase heightened the risk of serious injury." Pribonic's affidavit mainly finds that "Neveplast's airbag is unreasonably dangerous and defective," and that the Thunder Roll was not properly tested before being put into use. Pribonic's report, on the other hand, found that:

> cooler temperatures created condensate accumulation on the slide, reducing friction, thus causing Mr. Tuminello's tube to travel down the ramp much faster, and climb higher after exiting the kicker ramp. The unpredictable rotation of all riders, combined with the higher speed and higher launch, caused Mr. Tuminello to rotate approximately 135 [degrees] after launching from the kicker ramp and impacting the air bag.

Pribonic then stated, "It is my opinion that the subject slide contained multiple[] dangerous conditions, which were a proximate cause of the injury to Dino Tuminello." The report cites numerous failures by Epic to meet industry inspection standards and other factors, failures relating to the airbag, and finds Neveplast USA failed to provide Epic with proper maintenance instructions which was a proximate cause of Tuminello's injuries. It further states that Neveplast did not comply with ASTM standards by testing the Tubby Slide. In summary, Pribonic found:

> Neveplast should be sufficiently experienced in amusement ride and device development, construction, and user safety, by virtue of being a mass marketer of such devices. They should understand the need for proper engineering, specifications and replacement parts, and comply with all applicable industry standards and regulatory requirements. It failed to comply with such safety standards and manufactured and sold a defective and dangerous product which was a direct cause of the injuries to Dino Tuminello.

Based on the above, we find genuine issues of fact remain regarding the appropriate slope and height of the scaffolding, the slide, and the kicker and whether

21

the deviation from the Neveplast SRL template caused Dino's injuries. Moreover, due to the complex interrelated products and multiple parties involved at various steps along the way, we find it premature to dismiss the final product manufacturer, Neveplast USA, who was ultimately responsible for the Thunder Roll in its completed state, at this stage of the proceedings.

## *Design*

A second basis for imposing liability against a manufacturer is found in La.R.S. 9:2800.56, which provides:

> A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
>
> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
>
> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

A product does not automatically suffer from a design defect because someone was injured:

> "The occurrence of an injury does not give rise to the presumption that the design was unreasonably dangerous." *Rivers v. Remington Arms Co.,* No. 17-17124, 2018 WL 746392, at *4 (E.D. La. Feb. 7, 2018) (Africk, J.) (quoting *Robertson v. AstraZeneca Pharms.,* LP, No. 15-438, 2015 WL 5823326, at *4 (E.D. La. Oct. 6, 2015) (Barbier, J.)).
>
> Instead, to prove that a product's design was unreasonably dangerous—and therefore defectively designed under the LPLA—the plaintiff must ultimately show that " '[t]here existed an alternative design for the product capable of preventing the [plaintiff's] damage' and that the danger and gravity of that damage outweighed any adverse effects on the utility of the product and the burden on the manufacturer of adopting the alternative design." *Flagg*, 647 F. 5 at 316 (quoting La. Stat. § 9:2800.56) (second alteration added); see also *Guidry v. Janssen*

22

*Pharms., Inc.*, 206 F. Supp. 3d 1187, 1198 (E.D. La. 2016) (Feldman, J.) (setting forth the same risk-utility test); *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 412 (E.D. La. 1999) (Lemelle, J.) (same).

*Fuller*, 513 F.Supp.3d at 717-18.

Plaintiffs' argument in brief regarding design defect and the existence of an alternative design states (footnote omitted):

> [T]wo different alternative designs were identified by Neveplast USA itself. As mentioned, Neveplast USA argued that the Thunder Roll differed from its other kicker slide designs. In doing so, Neveplast USA identified the first alternative design: the original Neveplast kicker slide design. The second alternative design, also a Neveplast slide, had no kicker at all. Coincidentally, the non-kicker slide sat adjacent to the Thunder Roll at Epic entertainment. The non-kicker design was already readily available. Neveplast USA installed between five to thirty slides annually, yet the Thunder Roll was the first slide ever installed with a kicker ramp. As a result, two alternative designs exist-both by Neveplast itself.

Locher testified that the slide and kicker design all originated from Neveplast SRL and had been used and tested for many years. He said he was unaware of any design variation until he sent a picture of the completed design to an associate at Neveplast SRL who noted the change. Locher said that he did not know if the change was made by PERI, the construction group who erected the scaffolding (4G Structures), or if it was at Galloway's instruction. In any case, Locher felt the slope was less than the original design and that there were no issues as the slide was tested many times.

The "alternative design," i.e., the original Neveplast SRL design, may have been preferable from a safety standpoint. We note, however, that the record is devoid of any information indicating that to be true; however, due to the complexity of the issue, we find genuine issues of material fact remain. It is impossible to determine from the record the extent of the deviation of the scaffolding design from the initial diagram provided by Neveplast USA to PERI to the as-built design.

23

Questions remain regarding the effect of the deviation from the original Neveplast

SRL design as it related to various parts of the slide.

While the risky nature of this ride should have been evident to anyone who

chose to ride it, an assortment of factors played into the overall safety of the slide,

none of which were fully resolved in the hearing on the motion for summary

judgment.

### *Inadequate Warning*

A manufacturer can be found to be liable if it has failed at providing an

adequate warning under La.R.S. 9:2800.57 which provides:

> A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

> B. A manufacturer is not required to provide an adequate warning about his product when:

> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or

> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

> C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

Adequate warning is defined in La.R.S. 9:2800.53(9) as:

> "Adequate warning" means a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use

or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made.

In *Walker v. Manitowoc Co., Inc.*, 16-897, 16-898, 18-221, 18-223, p.17 (La.App. 3 Cir. 10/10/18), 259 So.3d 465, 477, a panel of this court stated:

> "Whether a particular warning or instruction is adequate is a question for the trier of fact." *Jack v. Alberto-Culver USA, Inc.*, 06-1883, p. 5 (La. 2/22/07), 949 So.2d 1256, 1259. Several factors come into play in determining the adequacy of the warning, namely: (1) "the severity of the danger," (2) the likelihood of successful communication of the warning to foreseeable consumers, (3) "the intensity and form of the warning," and (4) "the cost of improving the strength or mode of the warning." *Bloxom v. Bloxom*, 512 So.2d 839, 844 (La.1987). It stands to reason that this fact-intensive inquiry is both case-specific and industry-specific as the duty itself is one of "a reasonably prudent manufacturer." *See* La.R.S. 9:5800.57(C).

There must be a connection between the omitted warning by the manufacturer and a plaintiff's damage. *Hinson v. Techtronic Indus. Outlets, Inc.*, 126 F.Supp.3d 747 (W.D. La. 2015), *McCarthy v. Danek Med., Inc.*, 65 F.Supp.2d 410 (E.D. La. 1999). Further, a manufacturer has a duty to anticipate reasonable misuse and warn. *Easton v. Chevron Indus., Inc.*, 602 So.2d 1032 (La.App. 4 Cir.), *writs denied*, 604 So.2d 1315,1318 (La.1992). Products that present a serious risk of harm require that a manufacturer warn in such a way that it is likely to catch a user's attention. *Id.*

Plaintiffs argue in brief that, "Warnings of over-rotations and the possible injuries of such were neither given to Epic nor its riders. Therefore, Mr. Locher's instructions cannot satisfy Neveplast's duty to adequately warn." Plaintiffs go on to state: "The record is entirely devoid of any explanation of how to avoid landing head-first, the incumbent dangers of doing so, or the dangers of using the slide while wet. So, even if the slide were wet, which is denied, Neveplast USA's warnings were still inadequate."

Neveplast USA refers to the warning language in the waiver signed by Dino indicating that he was aware of the risk of "known and unanticipated risks that could result in physical or emotional injury including, but not limited to broken bones, sprained or torn ligaments, paralysis, death, or other bodily injury," and that "such risks simply cannot be eliminated without jeopardizing the essential qualities of the activity." Undoubtedly, any reasonable adult should realize the inherent dangers of propelling oneself off of the "kicker" and into the air and subsequently landing on an airbag.

However, we find numerous genuine issues of fact remain regarding the possibility of an inadequate warning including whether the standard boilerplate waiver language was sufficient to warn of this specific risk and whether the failure to provide a specific warning about over-rotation due to speed in wet and/or dry conditions to either the handler (Epic) or the user (Dino) created an unreasonable danger.

The operation of the slide itself is not according to any standard procedure with "adjustments" being made on instinct based on weather, the size of the riders, the employees' "test" rides of the day, and other factors. The kicker can be adjusted to speed up or slow down a rider's exit from the Thunder Roll. The risk-utility analysis is a detailed one that, when combined with the multitude of parties and other issues presented in this case, was not adequately addressed at the hearing on the motions for summary judgment. We find that the facts of this case, including a credibility determination of the Epic employee proposing that a percentage of riders did not land in an upright position, preclude a finding of no genuine issue of material facts regarding whether Neveplast USA should have provided warnings relating to over or under-rotation.

Moreover, while Neveplast USA's paperwork that it provides to buyers of the TUBBY Jump clearly indicate that the slide is not to be used when wet, a genuine issue of fact remains as to whether the slide actually was wet. While Epic settled with Plaintiffs, the issue of whether the slide was wet was not resolved. Additionally, issues remain as to whether Epic and/or Dino may have acted in a different manner if it had been warned of the specific danger of over-rotation and the resultant injuries that could occur.

***Express Warranty***

Finally, liability can be imposed on a manufacturer pursuant to La.R.S. 9:2800.58, which states:

> A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.

Express warranty is defined in La.R. S 9:2800.53(6):

> "Express warranty" means a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance. "Express warranty" does not mean a general opinion about or general praise of a product. A sample or model of a product is an express warranty.

To prevail on an express warranty claim, a plaintiff must show:

> "(1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that express warranty, and (4) the plaintiff's damage was proximately caused because the express warranty was untrue." *Guidry*, 206 F. Supp. 3d at 1199 (quoting *Caboni v. General Motors Corp.*, 278 F.3d 448, 452 (5th Cir. 2002)).

> "An 'express warranty' is a representation or statement about a product that affirms the product possesses specified characteristics or qualities." *Id.* (citing La. Stat. § 9:2800.53(6)). But an express warranty does not include a "general opinion" or "general praise" of a

product. *Id.* (quoting La. Stat. § 9:2800.53(6)). Put another way, "[t]he plaintiff must allege the content of the warranty and explain how the warranty was not true." *Donald,* [*v. Astrazeneca Pharmaceuticals, LP,*] 2017 WL 1079186, at \*4 [E.D. La. 2017].

*Fuller*, 513 F.Supp.3d at 721-22 (footnotes omitted).

A general claim of an express warranty will not suffice. *Id.* One must be exposed to the warranty and induced by it. *Id.* Plaintiffs' brief states, "In other words, Mr. Locher guaranteed the Thunder Roll was safe, to Epic and the Tuminellos, despite deviations in design." Plaintiffs' argument relies on the general assertion that the existence of the slide in an amusement park implies that the ride is safe and fit for use by the general public. This allegation is insufficient to satisfy this prong of the LPLA. Plaintiffs failed to set forth any facts suggesting that Dino was exposed to an express warranty, much less induced by it. The general allegation that a product did not perform as it was supposed to is insufficient to meet the requirements of an express warranty claim. In *Reynolds v. Bordelon*, 14-2371, p. 11 (La. 6/30/15), 172 So.3d 607, 615, (alteration in original) (emphasis in original) (footnote omitted), the supreme court stated as much:

> As stated by the court of appeal, the plaintiff did not "point to any specific express warranty given by Nissan, but instead claim[ed] generally that Nissan had given him the expectation that his vehicle's air bag system would mitigate his injuries in a severe automobile accident, and it did not." We cannot accept a general alleged warranty for purposes of an *express* warranty claim. The LPLA makes it very clear that in order for the manufacturer to be liable, there must be a specified stated warranty, i.e., *express.*

Plaintiffs point to no express warranty given by Neveplast USA and there is no evidence in the record that Neveplast USA made an express warranty of any kind to Plaintiffs. Plaintiffs' claim under the express warranty provision failed. Summary judgment was appropriately granted under this prong of the LPLA.

*Comparative Negligence*

Neveplast USA argues that Epic bore the sole responsibility for the accident for failing to heed Neveplast USA's warning to Epic related to weather conditions. In brief, Neveplast USA states:

> [A]s was the case at the trial court, Plaintiffs' appeal brief makes the unsupported conclusory argument that by Neveplast USA appearing at installation, testing the Neveplast materials at such time, and giving instructions to Epic on how to properly operate the materials (all of which are good things for a distributor to do), *this was somehow Neveplast USA's 'certification" of safety of the Thunder Roll for anyone and everyone who ever rode the Thunder Roll in the future.* [emphasis ours]. Meanwhile, in reality, Locher of Neveplast USA's actual testimony repeatedly demonstrates that he simply tested the functioning of the Neveplast materials on the date of installation–*i.e. at a time when the Neveplast instructions for proper use were acutally being followed.*

This argument ignores the principles set forth in *Champion*, 410 So.2d 1230. Epic's comparative negligence must be taken into consideration when assessing fault. The mere fact, though, that Epic settled with Plaintiffs does not relieve Neveplast USA, as the manufacturer of the final product, from its responsibility to ensure that the Thunder Roll, in its final state, was not unreasonably dangerous.

Plaintiffs supplied sufficient evidence via Locher's own testimony that the slide deviated from the original Neveplast SRL design schematics, that the slide lacked a formal testing mechanism as Locher himself testified that "testing" consisted of him riding the Thunder Roll a couple of dozen times, and that Locher provided no warning about the danger of overextension such that genuine issues of material fact remain to be decided at a trial. Whether these actions were a cause-in-fact of Plaintiffs' injuries remains to be seen, but in light of our above findings, a dismissal of Neveplast USA is premature as genuine issues of material fact remain.

## CONCLUSION

We affirm the trial court's grant of summary judgment in favor of PERI Formworks Systems, Inc. We affirm the trial court's grant of Neveplast USA's exception of no cause of action, as Plaintiffs' sole remedy lies under the LPLA. Neveplast USA, LC is a manufacturer under the statute. We reverse the trial court's grant of summary judgment relating to Plaintiffs' claims of design defect pursuant to La.R.S. 9:2800.56, composition or construction defect pursuant to La.R.S. 9:2800.55, and inadequate warning under La.R.S. 9:2800.57. We affirm the trial court's grant of summary judgment for Plaintiffs' express warranty claims under La.R.S. 9:2800.58. All costs of this appeal are assessed to Neveplast USA, LC.

**AFFIRMED IN PART;**
**REVERSED IN PART.**